Good morning, Your Honors. Peter Sessions on behalf of the Plaintiff Independent Panel, Joel Salz. There are two issues before the Court in this heuristic case today. The first is whether the District Court applied the correct standard of review, and the second is whether the claim administrator, Standard Insurance Company in this case, correctly interpreted and applied the plan definition of disability. I don't know if the Court has any preference as to which issue I'll take first. I'll take them in order then. The first issue is with regard to the standard of review. And as the Court is probably aware, there's been something of a sea change in the way heuristic cases have been handled in recent years. We've had the Abatey case, which is an unbanked case from this Court, and then the MetLife v. Glenn case, which is a Supreme Court case. And what both of these cases have done is really changed the way abusive discretion decisions are made by plan administrators in these cases. And what Abatey and Glenn have said is that trial courts in heuristic cases really have an obligation to weigh the evidence in these cases and determine whether the plan administrators are abusing their discretion or not under basically a totality of the circumstances case. Prior to Abatey and prior to Glenn, what we had was a regime in which there was what Abatey has called an onerous requirement on plaintiffs to prove that the conflict of interest that the plan administrator had somehow affected the decision. And what Glenn and Abatey say now is that that burden is no longer on the plaintiffs, and basically what plaintiffs are required to do now is to offer up evidence of the conflict of interest. And then the district court, regardless of how strong that evidence is, has to take into account, and the district court has to weigh the evidence and balance it with the conflict of interest evidence. And as a result, there are older Ninth Circuit cases that are no longer good law, and that's been confirmed by both Abatey and a more recent case, Montour v. Hartford. And what these cases have done is said that these older cases, and specifically I'm talking about Jordan v. Northrop Grumman and Boyd v. Bell, what these cases did was apply too strict of a standard. And what these cases applied is a, quote, clearly erroneous standard. And under that regime, district courts were allowed to uphold the decisions of claimed administrators, so long as the decisions made by those administrators were not clearly erroneous. And what Abatey and Glenn and Montour say is that that bright-line test of a clearly erroneous test is no longer the law, and instead we have this. Let me ask you this. What do you, if you read the district court's order, what does it say? Granting summary judgment for standard insurance. If you go through it, it, he cites both Abatey, he cites Jordan and whatnot. What do you really, what did he do wrong? Okay. Well, to be sure, the district court did cite these more recent cases. So that's not the issue here. The issue is whether those cases were correctly applied. That's what I'm asking. What did he do wrong? Well, what the district court did wrong was apply the clearly erroneous standard, which is lifted directly from Jordan and Boyd. And what the district court did was use the term clearly erroneous in reference to its application in this case no fewer than six times. And I'd be happy to give the court some quotes. Well, I have it right here. But so let me ask you this. Okay. So the district court recognized that there was a structural conflict of interest. Right. Right. That's correct. Okay. So what else, did you point to anything else that showed how the, how the insurance company exercised, you know, its sort of bias or conflict in how it treat, how it handled this case? Well, I think there are two primary ways in which the conflict of interest affected standards decision. And the first is a structural way, which is in almost all these cases, which is that standard is both the claim administrator and the payer of benefits. In other words, it has a financial incentive not to pay claims because it has to pay them. And so that's present in every case. And that's something that the court has to take into account. The other thing that standard did in this case, which we think shows a conflict of interest, is the way it applied the own occupation definition of disability in the plan. And that really goes more to the second issue that's raised in the briefs. And I'm happy to discuss that now. And the reason that I bring this standard review issue up first is because it's improper application of the outdated standard in Jordan and Boyd directly affected the outcome of the case. And we see this in the quote from the court, where the district court essentially laid out the roadmap for reversal, where he said that the conclusions of standards physician consultants and standard could only be said to be flawed if they were assessing plaintiff's restrictions based upon an erroneous understanding of plaintiff's job requirements. Therefore, standards decision in this matter was only arbitrary and capricious if its determination of plaintiff's own occupation was clearly erroneous. And so there we see the clearly erroneous standard, which is no longer good law. And there we see it being used in the court's evaluation of whether standard applied the own occupation disability definition correctly. And thus in the district court's own words, if standard misinterpreted the own occupation definition of disability, then by applying it to the plaintiff's own occupation, then standard necessarily abused its discretion. And our argument is that's exactly what happened here. Because the disability definition in this case says that a claimant is disabled if he or she is unable to perform with reasonable continuity the material duties of his or her own occupation. And own occupation is defined as any employment that quote, involves material duties of the same general character as the occupation you are regularly performing. So the key question here is whether in determining whether Mr. Sahls was disabled, did standard use an occupation whose duties were quote, of the same general character? And here we believe the answer is no. And we believe that this is not only a substantive mistake on standard's part, that they interpreted the plan wrong and that Mr. Sahls should therefore be entitled to benefits, but it's also a procedural error. The way they handled this question, the way they interpreted the plan definition, shows that the standard misinterpreted the plan definition. And the first is standard didn't really explain how it selected this job. Standard admitted to Mr. Sahls directly that it doesn't have a manual or any kind of rules instructing it how to select an own occupation. The vocational reports prepared by standard don't really contain any kind of reasoning process or explanation as to what occupations were most comparable to Mr. Sahls' occupation, how it selected the occupation it did over other occupations. Essentially what these reports say is this was Mr. Sahls' job, we think X is the analysis occupation. And so what's missing really is that analysis, that sort of discussion about what other options were out there and why this was the best one. And then not only did it make sense, but it made sense to Mr. Sahls. Well, it went to the Dictionary of Occupational Titles. It did. It did. And we discussed in a brief... What's wrong with that? Well, the difficulty with the Dictionary of Occupational Titles is basically that it's defunct. It went defunct nearly 20 years ago in 1991. And there's no explanation in the record for why Standard chose to use this outdated dictionary as opposed to the more updated database. And this is concerning, given the significant changes we've had in the workplace since 1991 with increased reliance on computer use. And we've cited several cases in our briefs that talk about how the DOT simply isn't reliable anymore. There's one case, Shapazian, which is a district court case from Georgia, which says one DOT is not reliable. You must ask whether the DOT descriptions are practically or legally viable in a dynamic and diverse labor market such as exists in this urban community or elsewhere. Now, certainly we're not asking the court to rule as a matter of law that the DOT should never be relied on. But certainly in this case, I think if we look at the job that Standard chose from the Dictionary of Occupational Titles... This is called Manager, Common Department, parentheses, Any Industry. So it's a very generic job title. And if you look at the duties and the physical requirements of that job and you compare it to what Mr. Sahls was doing, they're not very similar jobs at all. What did they identify as the duties of that position, the generic position? Well, the generic position provides... Only occasional reaching, handling, and fingering, which is very different from Mr. Sahls' job, which required constant keyboard use and continuous gross manipulation and simple grasping. The Manager, Department, Any Industry job allows for maximum self-regulated flexibility and position change. In other words, you can get up and down and move around as much as you like. Mr. Sahls' job was very simple. They spent continuous sitting at his desk, two hours plus at a time. Prolonged sitting on a repetitive basis. In a usual eight-hour workday, he sits for seven to seven and a half hours with near-continuous typing and repetitive motions of the fingers, elbows, wrists. They make it clear in the definition, though, that they're not insuring his specific job. No, and we don't dispute that Standard has the right to look... So what are they supposed to do, in your view? Standard has a right to look beyond... Under the definition, they have to look at the material duties of his job, his own occupation. Right. That's correct. And they're not limited to just his job. No, that's right. So what do they do? Well, I'd like to make two responses to that. And the first is that even though Standard is allowed to look beyond the claimant's particular job duties, it still has to take his job duties into account. And that's in the plan language itself. It says, in determining your own occupation, we are not limited to looking at the way you perform your job for your employer, but we may also look at the way the occupation is generally performed. So the word also necessarily implies that, yes, they may look beyond the job, but they also have to take into account... Right. They have to look at what he does. And the other response I'd give is that while they're allowed to look beyond the particular job duties, they still have to choose one of the same general character. And if you look at Mr. Salza's particular job duties, you can see that he was performing a variety of tasks for his company. He was a purchasing agent. He was doing some HR administrative work. He was doing database management. And so it seems to me the better course of action for Standard would have been to employ what other district courts have validated, which is a blended description, which doesn't try to do what the Shapazian court called pounding square pegs into round holes, but to try to take into account all these various duties that Mr. Salza did and try to blend together a generalized occupation that takes into account those duties. What's the best case, in your view, that lays out the approach that they should have followed? Well, the Shapazian court, I think, is probably most on point because it does talk about reliance on the DOT, and it does discuss trying to generalize. Because what the Shapazian court said was basically what I've just said, which is, look, we understand that insurance companies have a right to look beyond specific job duties. But at the same time, not only is the DOT not the place to look for those, but at the same time, you can't abstract the specific job duties to such an extent that at the end of the day, you have a generic job description that bears no resemblance to the specific job duties in the first place. I'm glad we're down to two issues, and the two issues, I think, are relatively simple. The first issue is, if I understand Appellant's argument correctly, because the district court used the word erroneous or clearly erroneous on, by his count, six occasions, the district court therefore necessarily was relying on Boyd or Jordan to reach its conclusion. I don't think that's a fair reading of the district court's opinion if you read it as a whole. Well, it seems like it's a little confusing. Well, this court in the Kaiser v. Standard case called it an infelicitous use of words and then affirmed the district court. He does use words by clearly erroneous, but you have to understand that the timing of this is when the sea change of the law that counsel was describing was occurring. So he does do that, but then he goes on to say the district court explicitly recognized it was questionable whether the any reasonable basis standard of Jordan was still applicable in light of Abadie, and then the court went on to note that the Ninth Circuit had departed from the Jordan approach in Abadie. What they said, what the court said at ER6, the standard of review does not change if there is a conflict, but the conflict of interest must be considered as one factor in determining whether the administrator abused his discretion, citing Abadie at 968. Now, where in his decision does he account for that conflict? He does say at ER7 he looks at the question of conflict, and he says here there is no such evidence of institutional bias. That's a direct reaction to the question of is the structural conflict of interest causing the court, or causing, excuse me, the insurance company to do something that's in its financial interest as opposed to doing the best it can for the insured. Now, this is a good point at which to look at what evidence there is in the record that might suggest bias or conflict of interest. Let's begin with the fact that apparently he was granted Social Security. Is that correct? Yes, Your Honor. But in no way did you look at or compare or decide whether this grant of Social Security was something which should affect your decision, and you didn't employ any independent doctors to examine him. Now, as I look at the insurance contract, he has an obligation to apply for Social Security. Do you agree with that? I believe that's correct, Your Honor, yes. So those two factors seem to me to suggest that there was some evidence of actions that perhaps evidenced some conflict of interest. Well, Your Honor, under the Nord case, the court is, or the insurance company is not required to grant a disability benefit just because the Social Security Administration does it. No, but it maybe needs to look at it, compare it, think about it, and there's no evidence that that was done. I respectfully disagree, Your Honor. In Glenn, the Supreme Court may have noted that, if I remember correctly. Yes, Your Honor. On November 21, 2005, Standard wrote to the appellant and said, among other things, with regard to, actually he was writing to his office on all available documentation that has been submitted on his behalf, and not the decision of the Social Security Administration that he qualifies for disability under their rules and regulations. So they did exactly what they were entitled to do. They acknowledge it, but they don't really look and see how that might compare with own occupation. Well, again, Your Honor, I respectfully disagree. They were sending the Social Security Award to the various doctors who were examining the medical records concerning Mr. Sahls, and including it as one of the factors that they should consider in making that determination. Is that in the record? Is it? Yes, Your Honor, I believe it is. Finally, with regard to your last point about they needed to, or might conceivably have considered sending him out to an independent physician. First of all, as a practical matter, that just can't be done in every one of these cases. It would make insurance prohibitively expensive. But more importantly, in this particular case, there's not any real disagreement between the doctors about what Mr. Sahls' medical condition is. You send it up to an independent medical examiner when his doctor says he has cancer, and the consultant says, no, he doesn't have cancer. Then you send it to an oncologist and say, okay, does he have cancer or does he not? But in this case, everybody was in basic agreement that, yes, he had some upper back problems. His physician said, well, that disabled him from his job, and the two or three physicians that looked at it from the standard viewpoint said, no, it doesn't at all. Not only can he do sedentary work, he can probably do moderate work. So I don't think there was any need for an independent physician to look at it. Now, turning to the second issue about how in the world did they get to this manager department job description that was raised by the appellant, the easy answer is that it started from appellant's initial claim. When he submitted his claim, he described his job as business manager. This is at ER 131. And he described it, support business unit director and other managers on government programs to develop proposals, purchase requests, facility operations, in-process new hires, corporate extension to contracts, subcontracts, human resources, and industrial security. They went from there to the manager department description from the DOT, as they're permitted to do under this Court's Aronsaf case. And I would point out to the Court that, among other things, that DOT definition acknowledges that a department head superintendent manager is using a computer. So even in 1991, we remembered computers. But 1991 is a rather different time from today. Apparently, the evidence was that he had to sit at the computer lengthy periods of time today to conduct his business, where you wouldn't have done that in 1991. Well, I don't know that the evidence is that, Your Honor. I think the evidence is what I just read to you from his own description of his own job. And he at no point says, gee, I need to sit at the computer all day long and work from the computer solely. Well, there's a reference. There's actually, it's a little misleading to say the standard relied on the DOT definition, because there's actually four different job descriptions that he considered, starting with his, and then going to the DOT, and then several others that came after that. And each time it came in, standards said, okay, let me see if this changes anybody's opinion. But there is one that references the fact that he has to sit for two hours at a time. But that also was considered, and the reaction of the standard was, I wish I could quote easily their turn of phrase, because it's better than mine, but basically he can get up and move around and do his job description. So I don't think it's fair to say he had to sit at the computer for seven, seven and a half hours at a time. I don't think there's any evidence in the record to support that. Let me just back up just a moment. Sure. A minute ago, in response to Judge Fletcher, you said that, or in response to when you're talking about the DOT, you said that the Ninth Circuit had approved use of the DOT in this context with our errand set decision. Yes, Your Honor. So it doesn't say, we haven't established, we haven't set any precedent. I don't know that there is Ninth Circuit precedent on that specific issue. But as I said, I don't think it's the main issue in this case. I don't think that standard took the DOT definition and said, you don't meet the DOT standard. Well, you know, what I found interesting here was that what they did, they said, this is sedentary. What he does is sedentary. Yes. And that's really all they looked at. His job is sedentary, and he's a manager, and therefore he can make the decisions about when he's going to get up and sit down. Well, I don't think it's very... That's it. So where do the material duties of his job ever get considered? Well, the material duties of his job start with his initial claim. When he describes what his job duties are, then standard goes to, okay, that sounds like the DOT. What does he do as a manager? According to him, this is what standard was given, and this is what standard considered, and this is what standard gave to all of its consultants. What he did was support business unit director and other managers on government programs, develop proposals, purchase requests, facility operations, in-process new hires, corporate extension to contracts, subcontracts, human resources, industrial security. So he's supervising all of those other areas. Now, they did get a job, standard did get a job description from his employer on December 7, 2004, which basically said his job involved coordination with corporate officers on employee matters, assisting with contracts and office management. That's at ER 204-205. And then there was another job description that came in on September 21, 2005, and that one came from his attorneys and said his essential job is human resources management for a staff of 100 employees. That's at ER 197-200. That's a job description that was approved by appellant and by his counsel. It's longer than that. It says responsible for development of contract proposals, negotiation of contracts, interface with subcontractors and vendors, managing purchase requisitions, management of security clearance at facility. Duties also include inventory control, database management, review of financial proposals, presentation development, and then the human resources reference. So in their view, the way he does that is it's sedentary in nature. Well, really, for these persons. That's what they say. I mean, one of these, I forget which one it is. I mean, they emphasize it. They say in kind of the DOT, the first thing that they do, it's interesting, they say this is a DOT, we classify it here. One who falls into this classification, they perform their work in a sedentary manner. I'm not disagreeing. I'm not disagreeing with the court that it's described as sedentary. I don't agree that it's end of story, because as I said, they've got four different descriptions of what sedentary means in this context that they're looking at. What it comes down to is that his doctor says he can't do his job anymore because he can't sit still. That's after Appellant, in his own voice, tells Standard, I don't have a problem with sitting anymore. And Standard then sends this issue out to two different independent consultants, physician consultants, both of whom say, no, he can work. He can get up and move around. At the end of the day, where does he say that he doesn't have any problems sitting? If you give me a moment, Your Honor, I'll find that for you. December 10, 2004, there was a telephone call. Appellant took the call while he was sitting by the pool and advised the person who called him, quote, sitting was not his main problem, period, close quote. So there's one reference to sitting, one doctor who says sitting, he can't do his job, and a host of other doctors who say he can get up and move around, and by the way, there's no neurological evidence that he has problems sitting anyway. And he said he could sit all day? No, he did not, Your Honor. My job is extremely sedentary. I don't know about yours, but there's no way I could sit for seven and a half hours. I'd be unable to walk. Unless I'm standing talking to a court, yeah, of course, it's sitting, but I can get up and walk around and use a speakerphone and do all sorts of other things to keep me from... And he can do that, too. He can do that sort of thing, too. And with respect back, let me close with the abuse of discretion standard. That is the standard that's been approved here by the United States Supreme Court and by the Ninth Circuit. And what that really means is this court and the district court should not be so involved in the minutia of what happens in these individual cases. It should be a simpler, cleaner, more streamlined process. That doesn't mean you can't overlook, review what the administrator did, but with respect and without meaning to suggest how any of you do your jobs, it doesn't seem to be an efficient use of your time when the small issue is... Well, you know, there's a real person here. Oh, I understand that, Your Honor. And he's out of work or whatever. He's not able to work at his former job. And he's getting, you know, he received Social Security Disability. You know how hard it is to get Social Security Disability benefits? I do, Your Honor. It's extremely difficult. I do. And they are very demanding. And I don't mean to ignore the... And when you talk about any other occupation, I mean, they could say, well, you could be a ticket taker. No, of the same general character. I mean, they're very demanding. And here the insurance company makes him apply for Social Security Disability benefits because they want him to get the money so they can deduct it. But then when they make the evaluation, it really doesn't count for a whole lot. It's not reflected in here. They didn't say, well, under the Social Security Disability law, this is what must be shown. This is what the decision was by the ALJ. There's a nice, long decision, or by the clerk who does the workup on it. And, you know, there's no... As Judge Fletcher said, there's no... It's just like, well, he applied, but they're different and we're going to do our own thing because we have a separate policy. And that's what the Nord case permits him to do, I think. Well, you know, the Supreme Court said in Glenn that, you know, failure to account... For one of the examples they gave when they were talking about things that insurers could look to for bias was, you know, not taking... Not looking at the... Something, for example, that's like a Social Security Disability determination. Agreed. Although, as I said before to Judge Fletcher, they did at least reference the Social Security Administration's conclusions. And did, apparently, send it to all of their consultants to review. All right. Thank you for your time. Your Honors, I think I can sum up fairly briefly. You know, this is a case where there's no dispute that Mr. Sahls has a serious spinal condition. There's no dispute as to his restrictions and limitations. I know counsel has made a comment about sitting, but both Sahls and Mr. Sahls have said that there's no dispute that Mr. Sahls has a serious spinal condition. And, of course, Standard, in the administrative record and in its briefing, has admitted that the restrictions and limitations issued by his doctor, including sitting restrictions and limitations, are legitimate. And there's no dispute in this case, I don't think, as to whether he's even disabled from doing his own particular job. And, of course, there's no dispute that he's receiving Social Security. But at the end of the day, Standard's position is, even though all these things are true, he's not entitled to the benefits. And what we're seeing here is a trend toward interpreting these kinds of provisions and these kinds of plans in order to find analogous occupations for claimants that they can just barely do with their restrictions and limitations. And this is a trend that was noted by the courts in Shepazian and in the Mitchell case and in the Dionita case. And the result is what we have is claimants who are indisputably disabled from performing their own jobs, but they're not entitled to benefits, according to claim administrators, because they can do the duties of this purportedly analogous occupation. And it's a disturbing trend, especially in this case, on its facts. And as a result, we urge the Court to reverse this case and reinstate its benefits. Thank you. Thank you. Thank you.
judges: Walter, Fletcher B. , Paez